UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JANET M. BALL

    Plaintiff,

v

BLUE CROSS AND BLUE SHIELD
OF MICHIGAN and
BLUE CROSS AND BLUE SHIELD
ASSOCIATION, a foreign entity,

    Defendants.
_____/

Case No. 4:06-cv-2

Hon. Wendell A. Miles

### OPINION AND ORDER ON DEFENDANT'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

Plaintiff Janet M. Ball filed this action in Michigan's Kalamazoo County Circuit Court. Ball was formerly employed by Blue Cross and Blue Shield of Michigan ("BCBSM"), which provided its employees with long term disability benefits pursuant to a plan sponsored and administered by Blue Cross and Blue Shield Association (the "Association"). In her complaint, she asserts claims for damages against both BCBSM and the Association, based on what she alleges was a wrongful denial of benefits under the plan.

The Association filed a Notice of Removal, in which BCBSM concurred. According to the Notice of Removal, Ball's claim seeks to enforce her alleged right to receive long term disability benefits under an employee welfare benefit plan. The Notice of Removal therefore invokes the court's federal question jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e), asserting that Ball's claim necessarily arises under and is governed exclusively by the terms of

the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.*

On February 22, 2006, BCBSM was dismissed with prejudice from this action pursuant to a stipulation by the parties. Therefore, Ball's claims against BCBSM are no longer at issue. Instead, the matter is currently before the court on a motion by the remaining defendant, the Association, for judgment on the administrative record (docket no. 18). Ball has opposed the motion. In her opposition, Ball has not claimed that this matter is not ripe for decision based on the administrative record. The court concludes that the matter is ripe for decision. For the following reasons, the court grants the Association's motion for judgment on the administrative record.

**I**

Plaintiff is a 57-year old woman who currently resides in Michigan. In 1983, she began working for BCBSM in the Kalamazoo, Michigan area, eventually attaining the position of account executive. BCBSM's job description for the position of account executive summarizes the position as follows:

> Increase the penetration of [the employer] in an assigned territory for group customers with 100 to 999 employees through the effective implementation of new business, retention and contract growth of existing accounts. If the geographical distribution of groups warrant, this position may be responsible for sales and service of groups of 100 or more. Plans, strategizes and coordinates benefit and financial funding for the retention and growth of all assigned group business, as well as the successful implementation of new group customers.

R. 261.[1] Some of the essential job functions of this position also included conducting planning

---

[1]The designation "R. __," as used throughout this decision, shall refer to designated pages of
(continued...)

and problem solving; communicating with management, performing customer relations, developing effective sales strategies, making account calls at account locations, and assisting agents in the field. (Both of the latter duties required driving.) R. 110-111, 261-262.

BCBSM provided its employees with group long term disability coverage through participation in what is known as the Non-Contributory National Long Term Disability Program ("the Program"), sponsored and administered by the Association. The parties are in agreement that the Program qualifies as an ERISA plan and that Ball, as an employee covered by the Program, is a participant in the Program. A Committee, appointed by the Association, serves as the named fiduciary of the Program for purposes of ERISA. R. 3-4. (In this decision, the court uses the terms "Committee" and "Association" interchangeably.)

The Program expressly provides, in pertinent part, as follows:

### 3. Benefit Entitlement

(a) A Participant shall be entitled to benefits under this Program if he is found, on the basis of medical evidence satisfactory to the Committee, to be Disabled. The date when a Participant becomes Disabled shall be determined by the Committee. A Disabled Participant shall submit to a medical examination at such time or times as the Committee requires, in order to determine whether he continues to be Disabled.

(b) A Participant ***shall not be eligible for benefits*** under the Program ***if the Committee determines that he became Disabled more than two years before the filing of the Participant's initial application*** for Disability Benefits under the Program. . . .

R. 6 (emphasis supplied). The Program required participants applying for benefits to also apply

---

¹(...continued)
the administrative record, a copy of which is on file with the court (docket nos. 21-22).

for Social Security disability benefits – though it was not necessary for participants to be awarded Social Security benefits in order to receive benefits under the Program. Specifically, the Program provided in pertinent part:

>     (c) As a Participant's benefit under [the Program] is reduced by 100% of the Participant's Social Security disability benefits, it is necessary for a Participant to provide the Committee with documentation of his Social Security Award or Denial determination. However, entitlement to benefits under the Program shall not be dependent upon entitlement to such benefits.
>
>     Entitlement to benefits under the Program will be conditioned on the Participant's satisfaction with the provisions of Paragraphs (i), (ii) and (iii), below:
>
>         (I) The initial monthly Disability Benefit payable to a Disabled Participant shall be reduced by the Committee's estimate of the Participant's Social Security disability benefit under Section 4(a). ***Within 18 calendar months after the date on which the Participant became Disabled, the Participant must submit a Social Security disability benefit award or denial determination.*** All payments to the Participant of Disability Benefits under the Program shall cease upon the Participant's failure to submit to the Committee a Social Security disability benefit Award or Denial determination within 18 calendar months after the date on which the Participant became Disabled, or the extended period described in the following sentence (if applicable), whichever expires later. ***Where the Committee receives information that the Social Security Administration ("SSA") has failed to rule on a Participant's application within such 18-month period, the Committee may in its discretion grant an extension for a specified period to permit the Participant to submit his Social Security disability benefit Award or Denial determination to the Committee as soon as it may be obtained from the SSA.*** If the Participant receives a Denial determination, the reduction for estimated Social Security disability benefits shall cease, and any needed adjustments shall be made. If the Participant receives an Award determination, the reduction for estimated Social Security disability benefits shall cease, the reduction for actual Social Security disability benefits [under the Program] shall commence as of the effective date of such benefits, and any needed adjustments shall be made.
>
>         (ii) . . . If the initial Social Security disability benefit application is denied, the Participant must take an administrative appeal (reconsideration) of the Denial, or reapply for Social Security disability benefits, within six calendar months of its date. . . .

>If the above administrative appeal is denied, the Participant must continue to pursue his claim for Social Security disability benefits to the administrative law judge level of the SSA. The Committee may, in its discretion, require the Participant to pursue his claim for such benefits to the appeals council level of the SSA. A Participant shall provide the Committee with proof satisfactory to the Committee of his continued efforts to obtain an Award.
>
>＊ ＊ ＊
>
>(vi) The Participant shall submit with his application for Disability Benefits under the Program a signed authorization (an "SSA Authorization") for the Committee to obtain information from the SSA regarding the status of the Participant's prior and pending claims for a Social Security Benefit . . .

R. 7-8 (emphasis supplied). The Program provided for a six-month waiting period before benefits became payable, providing as follows:

>The monthly Disability Benefit shall be payable as of the first day of the sixth calendar month coincident with or next following the date on which the Participant becomes Disabled with subsequent monthly Disability Benefits payable on the first day of each month thereafter.

R. 12.

A separate written agreement between BCBSM and the Association, under which the Committee is granted authority to administer the Program, provides that contributions to fund the Program are to be made by BCBSM. R. 37. This written agreement also addresses the authority of the Committee to construe the Program and to determine disability, providing in pertinent part:

>The Committee shall have complete control of the administration of the Program, with all powers necessary or convenient to enable it properly to carry out its duties in that respect. Without limiting the foregoing, the Committee has the power to construe the Program and to determine all questions that may arise thereunder. The Committee determines all questions relating to the eligibility of

5

>employees of [BCBSM], and the amount of benefits under the Program to which a Participating Employee is entitled.

[R. 40]

The Program's Summary Plan Description ("SPD") also contains certain relevant provisions, which include the following:

>**Application For Social Security Benefits**
>
>Most disabled employees also are eligible for Social Security benefits.  To help assure you receive all disability benefits to which you are entitled, ***this program requires you to apply for Social Security disability benefits when you become disabled. . . .***
>
>***You are required to submit information to the Program Administrator to show that you are attempting to obtain Social Security disability benefits. . . .***

R. 73.  The SPD further provided as follows:

>## Applying for Benefits
>
>After you are unable to work for 2 months your employer will send you a letter informing you of important details regarding the LTD Program.  Your employer will also advise the Program Administrator to mail to your home address the claim forms for you or your physician to complete.  For your claim to be processed quickly, it is important that these forms are filled out correctly and completely and are signed by you and your physician.
>
>Return these claim forms to the Program Administrator.  ***You have up to two full years after your injury or illness began to submit your claim for benefits.  If you file after the two years are up, your claim can be accepted only if you demonstrate to the Program Administrator that you were not reasonably able to file for benefits within the two year period.***

R. 80 (emphasis supplied).  The SPD specifically provides that the Program language controls over language contained in the SPD, and informs participants how to request examination or

Program documents free of charge:

> . . . **If there is any conflict between what is said in this SPD and the language in the LTD Program document (legal document), the LTD Program document will prevail.** You can examine these documents without charge by calling the Program Administrator's Communications and Compliance Specialist at the National Employee Benefits Administration, Blue Cross and Blue Shield Association, in Chicago, Illinois at 1-800-707-2288 to obtain a copy of the LTD Program.

R. 68 (emphasis in original).

September 25, 1998 was the last day Ball ever reported for work at BCBSM. Although she applied for and appears to have received short-term disability benefits for a time under either a separate ERISA plan or through some other arrangement (the precise nature of which is unclear), Ball never returned to work. BCBSM terminated Ball in February, 1999 after she had failed to respond to BCBSM's requests that she substantiate her continued absence from work. R. 236. Evidence in the administrative record indicates that beginning at some time before September 18, 2000 and continuing for approximately two years, Ball worked as a bookkeeper for a trucking business. R. 753, 788, 795, 826, 846, 863.

On February 18, 2004, over five years after she had last worked, Ball sent a letter to BCBSM, which was construed as an application for long term disability benefits under the Program and apparently forwarded to the Association for processing. R. 435. In her letter Ball explained,

> I was employed by BCBSM from September 1983 until September 1998. At that time I was put on medical leave by my physician. My disability ran out and I was advised that I had long term disability coverage. However, they could not process it *until after I applied for Social Security benefits.* . . .

7

> Therefore, I filed for Social Security in April of 1999. I was denied. I appealed and was denied again I was then admitted to the hospital in 2000 and missed the deadline for the second appeal. Due to my hospitalization/medical condition I was about to give up. But, at the suggestion of my therapist I hired a lawyer. He filed in January 2002 on my behalf. Through the process I was finally approved January 2004.

R. 435 (emphasis supplied). Ball included a copy of the SSA decision, which concluded that she had been disabled beginning on September 25, 1998. R. 443.

On April 6, 2004, the Committee denied Ball's application, expressly relying on the provisions of the Program and the SPD requiring applications for benefits to be filed not later than two years after the participant becomes unable to work. R. 417. In its letter of denial, the Committee stated that it had "no basis upon which it can accept an application for LTD submitted more than three years after the deadline to apply." Id. The record contains no indication that Ball appealed this decision.

In June, 2004, Ball, represented by counsel, filed a complaint in Kalamazoo County Circuit Court against BCBSM and the Association alleging that she had wrongly been denied long term disability benefits. The Association removed the action to this court. On September 3, 2004, the parties filed a stipulation to dismiss the action without prejudice after the Association agreed that Ball could re-file her claim for benefits, providing not only the details of her contention that she was told that she could not apply for benefits until she received a Social Security award, but also any other information pertinent to her claim for benefits. R. 403-405.

Ball, through her counsel, filed a renewed application for benefits under the Program on December 21, 2004. R. 406-407, R. 939-944. The "Claimant's Statement" which Ball was instructed to submit with her application was completed by her attorney, who listed a "Mental

8

Disorder" as the reason Ball was unable to complete the statement herself. R. 939. The Statement listed "September, 1998" as the date when her illness began resulting in her inability to work. Id. The Statement also described her illness as "inability to concentrate, panic disorder, depression." Id. This time, Ball included with her application an affidavit in which she stated that in "early 1999," she had telephoned the Detroit office of BCBSM and inquired about "the procedures for obtaining long term disability." R. 408. According to Ball's affidavit, during this conversation, she was informed "that I would have to apply for Social Security first *and* to obtain an award as necessary to qualify for long-term disability" id. (emphasis supplied).[2] Ball's affidavit also stated that because of her "diminished capacities" at the time, she "relied upon the information given to me as to the need to receive Social Security benefits before long term disability arose." R. 409.

The Committee, which considered Ball's renewed application as an extraordinary appeal to submit a delayed application for benefits, denied her application. The Committee stated that it had "failed to find circumstances that would allow waiving the timely filing provision." R. 200. More specifically, the Committee also concluded (1) that Ball had "presented no corroboration for her claim that she was given misinformation by her employer[,]" and (2) that the "medical evidence [did] not show mental illness or diminished capacity such that it was not reasonable to expect [Ball] to file her claim within the two year time frame[.]" R. 204.

## II

---

[2] Ball's affidavit differed from her February 18, 2004 letter insofar as her letter had stated only that she had been told she had to apply for Social Security benefits, whereas her affidavit stated that she had been told she had to both apply for and obtain an award of benefits.

In its motion, the Association argues that its decision denying benefits should be upheld because the administrative record demonstrates that the Association reasonably concluded that Ball had not filed her claim on time, had failed to demonstrate that she could not have filed within the allotted time, and was not "disabled" as defined by the Program documents.

The court assumes, for purposes of resolving the Association's motion, that Ball was "disabled" as defined by the Program, although that question is disputed. Assuming that she was disabled, the question becomes one of reviewing the Association's denial of benefits on timeliness grounds. Given Ball's assertion that her disability commenced on or about September 25, 1998, the two-year time period to apply for benefits under the Program would have expired on or about September 25, 2000.

When an ERISA plan grants the administrator discretionary authority to interpret the terms of the plan and to determine benefits, courts review challenges to those decisions under an "arbitrary and capricious" standard. Elliott v. Metropolitan Life Ins. Co., No. 05-6633, slip op. at 4 (6th Cir. Nov. 15, 2006). Here, the Association contends, and Ball does not dispute, that the arbitrary and capricious standard applies. The court agrees that this is the applicable standard. See University Hosps. of Cleveland v. Emerson Elec. Co., 202 F.3d 839, 845-846 (6th Cir. 2000) (plan language giving committee discretionary authority to determine eligibility for benefits and construe terms of plan constituted sufficient grant of discretionary authority to trigger application of arbitrary and capricious standard of review).

An ERISA plan administrator's decisions on eligibility for benefits are not arbitrary and capricious if they are rational in light of the plan's provisions. Shelby County Health Care Corp. v. Southern Council of Indus. Workers Health and Welfare Trust Fund, 203 F.3d 926, 933 (6th

10

Cir. 2000); Miller v. Metropolitan Life Ins. Co., 925 F.2d 979, 984 (6th Cir. 1991).  The question in any given disability case on "arbitrary and capricious" review is whether a plan can offer a reasoned explanation, based on the evidence, for its judgment that a claimant was not eligible for benefits within the plan's terms.  Elliott, No. 05-6633, slip op. at 4.  Although the arbitrary and capricious standard is not a "rubber stamp" for the administrator's determination, the decision will be upheld "'if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence.'"  Id. (quoting Glenn v. Metropolitan Life Ins. Co., 461 F.3d 660, 666 (6th Cir. 2006)).[3]  When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious.  Williams v. International Paper Co., 227 F.3d 706, 712 (6th Cir. 2000).  In reviewing a denial of benefits under ERISA, a district court "may consider only the evidence available to the administrator at the time the final decision was made."  Miller, 925 F.2d at 986 (6th Cir. 1991).  This includes evidence of what occurred during the administrative appeals process.  Id.

"Congress enacted ERISA 'to promote the interests of employees and their beneficiaries in employee benefit plans and to protect contractually defined benefits.'"  Shelby County Health Care Corp., 203 F.3d at 934 (quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 113, 109 S.Ct. 948 (1989)).  "As part of this goal, Congress intended ERISA plans to 'be uniform in

---

[3] Although deference in such situations must take into consideration whether the administrator is acting under a conflict of interest, e.g., Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S.Ct. 948, 957 (1989), Miller, 925 F.2d at 984, no such conflict is apparent here. Although the Association sponsors and administers the Program via the Committee, it neither funds nor otherwise insures the Program.  Instead, participating employers such as BCBSM contribute to a trust that funds the Program's administrative expenses and benefit payments. Accordingly, the Association does not itself stand at financial risk due to the payment of benefits to Ball and therefore does not operate under a conflict of interest.

11

their interpretation and simple in their application.'" Shelby County Health Care Corp., 203 F.3d at 934 (citation omitted).  Therefore, a plan administrator must discharge his duties with respect to the plan in accordance with the documents and instruments governing the plan, adhering to the plain meaning of the plan language as it would be construed by an ordinary person.  Id. "Eligibility for benefits under any ERISA plan is governed in the first instance by the plain meaning of the plan language."  Threadgill v. Prudential Securities Group, Inc., 145 F.3d 286, 292 (5th Cir. 1998).  Where a plan administrator purports to rely upon a plan exclusion to justify its denial of benefits, ERISA places the burden of proving an exclusion from coverage on the plan administrator.  Caffey v. UNUM Life Ins. Co., 302 F.3d 576, 580 (6th Cir. 2002).  Where the arbitrary and capricious standard applies, the fiduciary's interpretation of the plan's provision – including a limitation provision – must be upheld if it is reasonable.  Morrison v. Marsh & McLennan Cos., Inc., 439 F.3d 295, 302 (6th Cir. 2006).

### III

Under the arbitrary and capricious standard, and indeed under any standard, the Association's decision denying Ball long term disability benefits survives review.  In denying Ball's claim, the Association concluded that Ball had not applied within the two-year time limit required by the Program, but had instead applied over three years after the time limit had expired.  Because Ball expressly alleges that she became disabled from her employment on or about September 25, 1998, Complaint at 2, ¶s 6-7, and that she did not request long term disability benefits until February, 2004, id., ¶ 11, it is undisputed that Ball did not file a timely application for benefits.  Therefore, any burden the Association had to establish the applicability

of the exclusion based on timeliness is satisfied.

Even though the Program language contains no exception to the two-year time limit, the Association considered language contained within the SPD to determine whether Ball's application should be deemed timely notwithstanding the two-year time limit contained in the Program. Specifically, the administrative record shows that the Association considered whether Ball "was not reasonably able, due to mental illness or diminished capacity or any other reason," to file for long term disability benefits within the Program's two-year period to file. R. 200.[4]

The Association also considered whether Ball "had been misdirected and misinformed by her employer regarding the application process[.]" Id.

The Association concluded that it "did not find medical evidence that Ms. Ball was mentally incompetent or had diminished capacity such that it [was] unreasonable to expect her to have filed an LTD claim within the two year period." Id. at 203-204. The Association also concluded that it found "nothing" to support Ball's claim that she had talked to or been "misdirected or misinformed" by anyone at BCBSM about applying for long term disability benefits. Id. at 202.

The Committee concluded that there was no evidence corroborating Ball's contention

---

[4]Although federal law requires that effect be given to straightforward language in ERISA-governed plans, language in a plan summary may, under certain circumstances, control inconsistent terms in the plan. Lake v. Metropolitan Life Ins. Co., 73 F.3d 1372, 1379 (6th Cir.1996). Here, the Association has given effect to both the Program language and SPD language, which are not inconsistent insofar as the SPD may be read as providing a limited exception to the Program's limitation period. This approach comports with the law, which instructs courts "to read the SPD and the Plan documents as an integrated whole when there is no conflicting language." Morrison, 439 F.3d at 301-302.

that she was given misinformation by BCBSM regarding the procedures for applying for long-term disability benefits.  As noted above, Ball's contention was that someone in BCBSM's Detroit office told her that she would have to both apply for and be awarded Social Security benefits in order to qualify for benefits under the Program.  R. 408, ¶ 4.  Ball argues that it is a "*non sequitur*" that there was no evidence to corroborate her claim that she was given wrong information, because her telephone inquiry was an "informational inquiry" only and the record does not indicate that phone contacts on non-opened claims were recorded or documented.  Plaintiff's Response and Brief in Opposition at 14.  Ball also argues that the language contained in the SPD indicates that BCBSM should have provided her with an application and informational materials regarding the Program after she had been unable to work for two months.

However, even assuming that Ball's claim that she was given inaccurate information by BCBSM would impact her claims against that party, who has been dismissed from the action pursuant to stipulation, Ball cites to no legal support for her insinuation that *the employer's* alleged misinformation should impact her claims against the Association, as *administrator*.

"A fiduciary breaches his duty by providing plan participants with materially misleading information, 'regardless of whether the fiduciary's statements or omissions were made negligently or intentionally.'"  James v. Pirelli Armstrong Tire Corp., 305 F.3d 439, 449 (6th Cir. 2002) (citation omitted).  "Misleading communications to plan participants 'regarding plan administration (for example, eligibility under a plan, the extent of benefits under a plan) will support a claim for a breach of fiduciary duty.' " Id.  "[A] misrepresentation is material if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed decision in pursuing disability benefits to which she may be entitled." Id.

14

The record reflects that after Ball's termination, BCBSM responded to a voice message from Ball by sending her written information which she had requested regarding benefits. R. 240. However, even if the court assumes that BCBSM was a fiduciary who could be held liable for breach of fiduciary duty based on alleged oral misrepresentations concerning coverage under the Program, Ball has pointed to no evidence of misrepresentations made by the Association. Instead, her own affidavit is clear that the alleged misrepresentation was made by someone at the Detroit office of BCBSM. R. 408, ¶ 3. Ball does not contend that the Association gave her inaccurate information, and her concession that her telephone inquiry of BCBSM was "informational" only confirms that Ball did not intend her inquiry to be construed as a application for benefits under the Program.[5]

Ball contends that she relied on the inaccurate information allegedly provided by BCBSM because of her "diminished capacities[.]" R. 408-409, ¶ 7. In her briefing, Ball argues that her mental illness affected her ability to communicate; she implies that this justifies her belated application for benefits. Even though it did not credit Ball's claim that she was given inaccurate information by BCBSM, the Committee nonetheless considered whether it was reasonable to expect Ball to understand or become informed about the requirements of the

---

[5]The Committee also noted that BCBSM had made multiple attempts to contact Ball by telephone before terminating her from her employment in February, 1999, but that these attempts were unsuccessful, apparently because Ball had moved to Arkansas. R. 203. The record indicates that Ball had already moved to Arkansas by January, 1999, when she told a psychologist in Arkansas that she had moved to the area to be close to her husband, who was in federal prison in Memphis. R. 487.

The record also shows that Ball was given the opportunity by BCBSM to substantiate her continued absence from work before she was terminated, but she failed to respond. R. 288. It is notable that Ball did not respond in writing requesting to be considered for long-term disability benefits.

15

Program, including the two-year limitation period.  Among other things, the Committee noted that Ball had been able to apply for Social Security benefits in January, 1999, R. 203, a fact confirmed by Ball's own affidavit.  R. 408, ¶ 5.  The Committee also noted that Ball had been able to apply for short-term disability benefits in 1998, after the commencement of her alleged disability.  R. 203.

That Ball was able to apply for both federal and short-term disability benefits under another ERISA plan strongly supports the conclusion that Ball was reasonably able to timely apply for long-term disability benefits under the Program – had she chosen to do so.[6]  Moreover, even if could be determined that Ball's illness occasionally affected her ability to communicate, nothing in the record would justify extending the application deadline for a time period of over three years beyond the generous two-year period already provided by the Program.  The court concludes that the Association offered a reasoned explanation, based on the evidence, for its

---

[6]Blue Cross argues that additional evidence supporting the conclusion that Ball's alleged disability did not prevent her from applying for long term disability benefits is contained in the medical records, which indicate that Ball worked as a bookkeeper for a trucking business from September, 2000 through part of 2002.  Blue Cross argues that this is a type of job which would require a high level of functioning.  Ball argues that information contained in the medical record indicating that she worked as a bookkeeper is false.  She contends that the source of this information is an allegedly erroneous computer entry at an Arkansas medical clinic where she received care.

Ball never presented evidence – at the administrative level where it was required to be presented – that this job history is inaccurate, nor she does appear to have argued to the Committee that the medical records contained misstatements.  The court notes that although the Committee appears to have considered this employment history in reaching its decision, R. 207-208, it did not list this as a factor in its denial of benefits.  Although the court concludes that substantial evidence – including Ball's ability to apply for Social Security benefits – supports Blue Cross' conclusion that Ball was reasonably able to timely apply for benefits under the Program, evidence that Ball was able to hold a job as a bookkeeper at the precise time that the application period was about to expire would of course provide additional support for the decision.

judgment that Ball was not eligible for benefits within the Program's terms.

To repeat, nothing in the medical record suggests that Ball was disabled to such an extent that it was not reasonable to expect her to both understand and timely assert her rights under the Program. In addition, the record shows that Ball had a long history of employment in the insurance industry, which included ten years as an insurance adjuster preceding her lengthy employment in both claims and sales with BCBSM. R. 941. Ball does not contend that the Program language is unclear, and given her own experience in the insurance industry she cannot reasonably claim that she would not have understood the Program's requirements.

Finally, Ball seemingly expresses frustration that she has allegedly been determined to be disabled for purposes of receipt of Social Security disability benefits but not for purposes of receipt of long-term disability benefits under the Program. However, a determination that a claimant is disabled under the Social Security regulations does not require an ERISA plan administrator to reach the same conclusion. Coker v. Metropolitan Life Ins. Co., 281 F.3d 793, 798 (8th Cir. 2002); see Black & Decker Disability Plan v. Nord, 538 U.S. 822, 832-33, 123 S.Ct. 1965, 1971 (noting the "critical differences between the Social Security disability program and ERISA benefit plans"). Here, the Program does not incorporate the definition of disability provided by law in Social Security determinations. In addition, the language contained in the SPD can be and has been reasonably read by the Association to require a claimant to show more than disability in order to demonstrate that she was not reasonably able to apply for benefits within the two-year period required by the Program. Ball was mistaken if she assumed that a favorable Social Security outcome would assure her a favorable outcome on an untimely claim for ERISA benefits. Ball's lack of diligence in asserting her rights under the Program, which

cannot be explained by her illness alone, itself provides a reasonable basis for the Association's denial of her claim for benefits.

## **CONCLUSION**

The decision to deny Ball's claim for benefits as untimely was based on a reasonable application of the terms of the Program and is strongly supported by the evidence in the administrative record. The court will therefore enter judgment in favor of the Association.

So ordered this 23rd day of January, 2007.

 /s/ Wendell A. Miles
Wendell A. Miles, Senior Judge